IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| ERIKA PERNELL | ) | |
| PLAINTIFF, | ) | CIVIL ACTION NO. |
| | ) | |
| VS. | ) | HON: |
| | ) | |
| LEO'S CONEY ISLAND OF WEST BLOOMFIELD, | ) ) | |
| | ) | |
| DEFENDANT. | ) | |
| | ) | |

## COMPLAINT

PLAINTIFF, ERIKA PERNELL by and through her attorneys, CARLA D. AIKENS, P.L.C., submits the following Complaint against LEO'S CONEY ISLAND OF WEST BLOOMFIELD ("Defendant).

## JURY DEMAND

COMES NOW PLAINTIFF, ERIKA PERNELL, and hereby makes her demand for trial by jury.

## JURISDICTION

1. At all times relevant to this action, Erika Pernell was a resident of Wayne County in the State of Michigan.

2. Defendant is a Michigan restaurant with multiple locations with a continuous and systematic place of business located business at 7160 Orchard Lake, West Bloomfield, MI 48322.

3. The actions giving rise to this complaint took place at the West Bloomfield location.

1

4. This action is brought in this Court on the basis of federal question jurisdiction, pursuant to Title VII of the Civil Rights Act of 1964, 42 USC 2000e et seq.

5. Pursuant to 28 U.S.C. §1367, this Court has supplemental jurisdiction over Plaintiff's state law claims.

## VENUE

1. Venue is proper in the Eastern District of Michigan pursuant to Section 706(f)(3) of Title VII, 42 U.S.C. § 2000e-5(f)(3), because the unlawful employment discrimination giving rise to Plaintiff's claims occurred in this District.

## STATEMENT OF FACTS

6. On October 4, 2021, Plaintiff Erika Pernell was hired by Defendant as a waitress.

7. Pernell is an African American woman.

8. Pernell was a highly skilled waitress, known for her comforting hospitality.

9. Pernell was excited to start her new waitressing position with Defendant.

10. Unfortunately, it did not take long for Pernell to notice some irregularities with the tip policies.

11. After a couple weeks of working, Pernell inquired with one of the restaurant managers about the policy and procedures for tipping.

12. As a result of her inquiry, the restaurant manager unsuccessfully advised one of the tenured waitresses, a white female, to show Plaintiff how to conduct the process on her own.

13. Later in the workday, Pernell, with a keen eye to detail, alerted the tenured waitress of the mistake she made bagging an order.

14. Despite Pernell's good intent, the tenured waitress was upset and complained to Pernell that she knew what she was doing, as she had been employed by Defendant for 26 years.

15. Pernell asked the tenured waitress not to yell at her or disrespect her.

16. The following day, October 22, 2021, Pernell was working her shift when a tall man whom she had never seen before appeared to the right of her.

17. Pernell looked up and the man, who yelled at her: "yeah b**** talk that s*** now" "ma do we have a problem? Where the b**** at?" ~

18. Responding to the man's question, the tenured waitress nodded in Pernell's direction.

19. Immediately after, the man pulled out a gun in front of Pernell and said "b**** do you got a problem?"

20. Astonished by the events that were transpiring, Pernell attempted to get her phone out and call her son for help. However, the store owner and one of the cooks pulled her to the back office.

21. While in the back office, Pernell called the police, despite the store owner insisting against it.

22. Pernell informed the police that someone pulled a gun on her at Defendant's place of business.

23. During her phone call with the police, the store owner told Pernell that she should get off the phone and "let [him] handle it."

24. Reluctantly, Pernell terminated the phone call with the police and demanded the video camera footage of the incident.

25. Despite having terminated the phone call with the police, the police still arrived at Defendant's principal place of business.

26. Once the police arrived, the owner falsely informed them that the people involved in the altercation were customers.

27. Pernell was locked in the back office while the events with the police transpired, and the tenured waitress was still able to work her shift.

28. While in the back office, Pernell observed Defendant lock the door to keep her inside the back office.

29. Pernell did not feel safe attempting to get out of the back office due to the man with the gun still being inside of the restaurant.

30. Hours later, Pernell was released from the back office.

31. The next day, October 23, 2021, Pernell called Defendant to ask if she should come into work.

32. Upon calling Defendant, Pernell was informed that she should stay home to avoid any retaliation.

33. Pernell called Defendant later in the evening to inquire about coming into work the following day. In response, Defendant informed Pernell that she should stay home for the week and would be compensated.

34. Upon arriving at the restaurant to pick up her check, Defendant told Pernell that she would be transferred to a new job location in Shelby Township to avoid any further retaliation.

35. However, the new job location was out of the way in Macomb County and she would not be able to get to the new location and still work at another job she already had prior to starting work with Defendant.

36. Defendant had already asked her to work at the Shelby Township location when she began work for Defendant, and she had alerted them to the fact that this would not be possible due to the distance of the location.

37. Because she was not able to work at another location, Defendant's move of Plaintiff amounted to a constructive termination.

38. The white, tenured waitress was not reprimanded in any way and was allowed to continue working while Pernell was out of a job.

39. Further, the white tenured waitress was not terminated nor moved to another location.

40. In addition, the white tenured waitress had previously had her son threaten African American waitresses and nothing was done, despite complaints, while the African American waitresses were terminated and/or moved to new locations.

41. Defendant further permitted the white tenured waitress to steal tips without any discipline, in particular from African American employees, who complained about the conduct and that the white waitress was being treated differently, though nothing was done.

42. Non-African American employees were generally treated better, given more "leeway" and not disciplined while African American employees were terminated for minor or nonexistent offenses.

43. Plaintiff requests relief as described in the Prayer for Relief below.

## EXHAUSTION OF FEDERAL ADMINISTRATIVE REMEDIES

44. Ms. Pernell exhausted her administrative remedies and satisfied this jurisdictional prerequisite.

45. Ms. Pernell filed a Charge of Discrimination with the Equal Employment Opportunity Commission regarding Defendant's discriminatory conduct.

46. The Equal Employment Opportunity Commission issued a Notice of Right to Sue on June 24, 2022. This lawsuit followed.

# COUNT I
## DISCRIMINATION ON THE BASIS OF RACE IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. 2000e et seq. ("Title VII")

47. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

48. At all material times, Defendant was an employer and Plaintiff was an employee covered by, and within the meaning of, Title VII, as amended.

49. Defendant's conduct, as alleged herein, violated Title VII of the Civil Rights Act of 1964, which makes it unlawful to harass or discriminate an employee on the basis of that employee's race.

50. Plaintiff is an African American woman, and, as a result, is a member of a protected class pursuant to Title VII.

51. Plaintiff was subjected to offensive communication and/or conduct on the basis of her membership in this protected class, which Defendant was aware of and did nothing to stop it.

52. Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

53. The unwelcomed conduct and communication was intended to and in fact did substantially interfere with Plaintiff's employment and created an intimidating, hostile, and/or offensive work environment as alleged in the statement of facts.

54. As a proximate result of the Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

55. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proven at trial.

56. Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT II

## DISCRIMINATION ON THE BASIS OF RACE IN VIOLATION OF THE MICHIGAN ELLIOTT-LARSEN CIVIL RIGHTS ACT, MCL 37.2101 et seq. ("ELCRA")

57. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

58. At all material times, Defendant was an employer and Plaintiff was an employee covered by, and within the meaning of, ELCRA.

59. Defendant's conduct, as alleged herein, violated the ELCRA, which makes it unlawful to harass or discriminate an employee on the basis of that employee's race or skin color.

60. Plaintiff is an African American woman, and, as a result, is a member of a protected class pursuant to ELCRA.

61. Plaintiff was subjected to offensive communication and/or conduct on the basis of her membership in this protected class, a

62. Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

63. The unwelcomed conduct and communication was intended to and in fact did substantially interfere with Plaintiff's employment and created an intimidating, hostile, and/or offensive work environment as alleged in the statement of facts.

64. As a direct and proximate result of the Defendant's wrongful acts and omissions, Plaintiffs have sustained loss of earnings, earning capacity, and fringe benefits and have suffered mental anguish, emotional distress, humiliation and embarrassment, and loss of professional reputation.

65. Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT III

## RETALIATION IN VIOLATION OF TITLE VII

66.     Plaintiff incorporates by reference all allegations in the preceding paragraphs.

67.     At all material times, Defendant was an employer and Plaintiff an employee, covered by, and within the meaning of Title VII.

68.     Defendant's conduct, as alleged herein, violated Title VII of the Civil Rights Act of 1964, which makes it unlawful to retaliate against an employee for engaging in protected activity.

69.     A respondeat superior relationship existed because Defendant had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct Plaintiff's daily work activity, as alleged in the statement of facts.

70.     Plaintiff engaged in protected activity when she took the following actions, including but not limited to, informing Defendant that the white waitress was stealing money from her and other African American employees, refusing to allow her to remedy the situation, instead firing her after the white waitress' son pulled a gun on her at work, locking her in an office to prevent her from talking to the police about what happened, terminating her after she came forward, and attempting to move her to another location while doing nothing to the white waitress.

71.     Defendant, through its employees, had knowledge that Plaintiff engaged in protected behavior.

72.     Defendant and/or its agents took adverse employment actions against Plaintiff, including but not limited to constructively terminating her.

73.     But for Plaintiff's participation in protected activity, Defendant would not have taken said adverse employment actions against Plaintiff.

74. Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

75. Plaintiff notified Defendant and its agents of the unwelcomed conduct or communication and Defendant failed to remedy the unwelcomed conduct or communication.

76. As a proximate result of Defendant's retaliatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

77. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proved at trial.

78. Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT V

## RETALIATION IN VIOLATION OF ELCRA

79. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

80. At all material times, Plaintiff was an employee, and Defendant was an employer covered by, and within the meaning of, the ELCRA.

81. Defendant's conduct, as alleged herein, violated the ELCRA, which makes it unlawful to retaliate against an employee who has engaged in protected activity.

82. A respondeat superior relationship existed because Defendant had the ability to undertake or recommend tangible decisions affecting Plaintiff and/or the authority to direct Plaintiff's daily work activity, as alleged throughout this complaint.

83. Plaintiff engaged in protected activity when she took the following actions, including but not limited to, informing Defendant that the white waitress was stealing money from her and other African American employees, refusing to allow her to remedy the situation, instead firing

9

her after the white waitress' son pulled a gun on her at work, locking her in an office to prevent her from talking to the police about what happened, terminating her after she came forward, and attempting to move her to another location while doing nothing to the white waitress.

84. Defendant, through its employees, had knowledge that Plaintiff engaged in protected behavior.

85. Defendant and/or its agents took adverse employment actions against Plaintiff, including but not limited to constructively terminating her.

86. Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiffs rights.

87. Plaintiff notified Defendant's agents of the unwelcomed conduct or communication and Defendant failed to remedy the unwelcomed conduct or communication.

88. As a proximate result of the Defendants' discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

89. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proved at trial.

90. Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT VII

### HOSTILE WORKPLACE ENVIRONMENT IN VIOLATION OF TITLE VII

91. Plaintiff incorporates by reference all allegations in the proceeding paragraphs.

92. At all material times, Plaintiff was an employee, and Defendant was an employer covered by, and within the meaning of the Title VII.

93. A respondeat superior relationship existed because Defendant had the ability to undertake

or recommend tangible decisions affecting Plaintiff and/or the authority to direct Plaintiff's daily work activity, as alleged throughout this complaint.

94. Defendant's conduct, as alleged herein, violated Title VII, which makes it unlawful to create a work environment that a reasonable person would consider intimidating, hostile, or abusive.

95. Defendant intentionally created an environment, more fully laid out in the statement of facts and herein the complaint, in which Plaintiff was subjected to harassment on the basis of her race, which included being harassed by the white tenured waitress and her son, eventually having a gun pulled on her, being locked in the back office, and being unable to speak to the police.

96. Defendant knew specifically of Plaintiff's mistreatment because she made a complaint.

97. This type of conduct was intended to, and did interfere with Plaintiff's employment, and created an intimidating, hostile, or offensive work environment, as alleged in the statement of facts.

98. Defendant's hostile work environment was culminated intentionally, with malice, or with reckless indifference to Plaintiff's rights.

99. But for Defendant's illegal discrimination and retaliation, and the environment that that discrimination and retaliation created, Plaintiff would not have been damaged nor constructively terminated.

100. As a direct and proximate result of Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

101. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proven at trial.

102. Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT VII

### HOSTILE WORKPLACE ENVIRONMENT IN VIOLATION OF ELCRA

103. Plaintiff incorporates by reference all allegations in the proceeding paragraphs.

104. At all material times, Plaintiff was an employee, and Defendant was an employer covered by, and within the meaning of the ELCRA.

105. A respondeat superior relationship existed because Defendant had the ability to undertake or recommend tangible decisions affecting Plaintiff and/or the authority to direct Plaintiff's daily work activity, as alleged throughout this complaint.

106. Defendant's conduct, as alleged herein, violated the ELCRA, which makes it unlawful to create a work environment that a reasonable person would consider intimidating, hostile, or abusive.

107. Defendant intentionally created an environment, more fully laid out in the statement of facts and herein the complaint, in which Plaintiff was subjected to harassment on the basis of her race, which included being harassed by the white tenured waitress and her son, eventually having a gun pulled on her, being locked in the back office, and being unable to speak to the police.

108. Defendant knew specifically of Plaintiff's mistreatment because she made a complaint and because the white waitress had done the same thing to other African American employees, in particular those who complained about her stealing tips.

109. This type of conduct was intended to, and did interfere with Plaintiff's employment, and created an intimidating, hostile, or offensive work environment, as alleged in the statement of facts.

110. Defendant's hostile work environment was culminated intentionally, with malice, or with reckless indifference to Plaintiff's rights.

111. But for Defendant's illegal discrimination and retaliation, and the environment that that discrimination and retaliation created, Plaintiff would not have been damaged nor constructively terminated.

112. As a direct and proximate result of Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

113. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proven at trial.

114. Plaintiff requests relief as described in the Prayer for Relief below.

## RELIEF REQUESTED

PLAINTIFF Erika Pernell respectfully requests that this Honorable Court enter judgment against Defendant as follows:

1. Compensatory damages in whatever amount to which Plaintiff is entitled;
2. Exemplary and/or punitive damages in whatever amount which Plaintiff is entitled;
3. An award of lost wages and the value of fringe benefits;
4. An award of interest, costs, and reasonable attorney fees; and
5. An order awarding whatever other equitable relief appears appropriate at the time of final judgment.

Dated:  September 22, 2022								Respectfully Submitted,

/s/ Carla D. Aikens
Carla D. Aikens (P69530)
Rejanaé M. Brooks (P85701)
CARLA D. AIKENS, P.L.C.
*Attorneys for Plaintiff*
615 Griswold Ste. 709
Detroit, MI 48226
carla@aikenslawfirm.com
rejanae@aikenslawfirm.com